Filed 10/31/23 P. v. Hatter CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B322177 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA240172-03) |
| v. | |
| CLAUDELL HATTER, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Ronald S. Coen, Judge.  Reversed with direction.

Law Office of Marc Eric Norton and Marc Eric Norton for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

Claudell Hatter participated in an armed robbery during which his accomplice shot and killed a security guard. A jury convicted Hatter of felony murder. Thereafter, he petitioned for resentencing under then recently enacted Penal Code[1] section 1172.6,[2] which limited accomplice liability for murder. After an evidentiary hearing under that section, the trial court denied Hatter's petition, finding that he was a major participant in the felony who acted with reckless indifference to human life, and alternatively, that he committed implied malice murder. Hatter now appeals the trial court's order denying his petition. Because we find that there was insufficient evidence to support the finding that Hatter acted with reckless indifference to human life or committed an implied malice murder, we reverse the order and remand for further proceedings.

## BACKGROUND

I.   The robbery and murder[3]

Hatter was jointly tried with Rollin Denem, Thomas Bridges, and Wardell Joe.

"The evidence at their trial showed that in 1998, the men, assisted by Reginald Howard, Jesse Singleton, Amar Mobley, and

---

[1]   All further undesignated statutory references are to the Penal Code.

[2]   Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.)

[3]   The background is from *People v. Denem* (Feb. 21, 2023, B318106) [nonpub. opn.]. On our own motion, we take judicial notice of that opinion. (Evid. Code, § 452, subd. (d).) We have also taken judicial notice of the record in *People v. Bridges* (Jan. 30, 2006, B176263) [nonpub. opn.]. (Evid. Code, § 452, subd. (d).)

2

Tiasha Croslin, committed an armed robbery at a market during store hours, when employees and customers were present.  The robbers were all members of 69 East Coast Crips, except Bridges, who was a member of a related gang, and Croslin, Bridges's girlfriend, who had been a member of a San Diego gang.  In the course of the robbery, Howard shot and killed the security guard, Juan Hernandez.  The robbers also took Hernandez's gun. Bridges robbed a cashier at gunpoint, obtaining money and food stamps.  Leonard Jackson, a gang associate of the robbers, arrived at Hatter's home just as the robbers returned from the crime scene.

"Eyewitness Gilbert Davis lived down the street from the market.  He became suspicious when he saw a Buick Regal, an Oldsmobile Cutlass, and a Pontiac Trans Am in front of his home. Davis saw four men enter the market.  Davis and his friends walked toward the market.  The Cutlass's driver, who was alone in the car, looked straight ahead.  Someone then got into the Cutlass, and they took off.

"A market employee saw three men looking around the store.  One man, identified as Denem, wore a hat and had long curly hair.[4]  Denem ordered everyone to get down, pointed a gun at the ceiling, and fired one shot.  Thirty seconds later, the employee heard another shot.

"The market's cashier saw the security guard struggling with two men.  The cashier heard a gunshot and saw one of the men run from the market.  The cashier ran to the manager's office, but the manager locked the door before she could enter.

---

[4]    There is no dispute that Denem had disguised himself with a hat and wig.

An armed man took her at gunpoint to the cash registers and forced her to empty their contents into a bag.

"The crime went unsolved for two years until Jackson offered to assist law enforcement in the hope of obtaining a reduction of a prison term he was serving. In 2001, Jackson identified six of the robbers and offered the name of the seventh, Denem. The detective then showed photographic lineups to the market employees. One identified Singleton and Bridges; a second identified Howard; and two others identified Singleton. The cashier could not identify anyone, although, at trial she thought that Bridges looked similar to the man who forced her at gunpoint to empty the cash registers.

"The neighbor who lived down the street, Davis, identified Hatter and Croslin as the individuals he had seen in the Regal outside the market and identified Joe as the driver of the Cutlass.

"Croslin, who was now incarcerated in connection with an unrelated bank robbery, admitted her role in the robbery and identified the participants.[5] She and Jackson testified against Denem and his codefendants. At trial, Croslin testified that at the time of the crimes she lived with Bridges, and Jackson lived in the house in front of them. Through Bridges, Croslin met Hatter and Denem, both of whom were members of the 69th Street Crips. Hatter's nickname was Doughboy and Denem's

---

[5] Croslin initially faced a term of life without the possibility of parole for her involvement in the robbery. However, Croslin pleaded no contest to one count of voluntary manslaughter and two counts of robbery in exchange for a prison term of 12 years and her truthful testimony in this case.

nickname was Baby Doughboy, indicating the two had a close relationship.

"On the morning of the robbery, Bridges and Croslin went to Hatter's home where Denem, Hatter, Joe, Bridges, Singleton, Howard, and Mobley discussed a robbery. Hatter said he needed money to get a car out of impound. When the conversation ended, Bridges told Croslin to get into a Regal with Hatter, who then drove them to the market. After Hatter and Croslin entered the market, Hatter said, 'This is where we're going to hit.' Hatter and Croslin made a purchase, then left the store. They drove past a Cutlass driven by Joe and a parked Trans Am driven by Mobley. Shortly thereafter, Hatter and Croslin drove past the market and saw individuals running from it.

"After the robbery, the entire crime team returned to Hatter's home. Howard was pacing and repeatedly said, in a scared manner, 'I killed him, I killed him.' They divided the money and food stamps obtained in the robbery.

"When Croslin later learned that the security guard had been killed, Bridges told her, 'Howard was tussling with the security guard and shot him.' Bridges indicated his role was to get the money from the safe in the office with Denem or Singleton, and Howard was supposed to distract the security guard. Bridges said Denem wore a disguise of a hat and a curly wig.

"Jackson testified that he was at Hatter's home when the robbers returned from robbing the market. Denem had a hat and a wig. Once inside, they argued. Hatter asked where the money was, and Bridges said they only got food stamps and complained that they would have gotten more if Howard had not been 'so trigger happy.' They divided the food stamps among themselves

and gave Jackson some. When they saw a news report[ ] of the robbery, Bridges and Denem said police sketches of the suspects did not look like them, and Denem laughed because the sketches depicted him as having long hair.

"Two days after the robbery, Jackson was arrested for violating parole. Approximately five months after telling a detective what he knew about the robbery, Bridges and Jackson were incarcerated together. Bridges related details of the crime to Jackson, saying that Hatter and Croslin entered the store first to 'check the move out[.]' Bridges said he and Denem intended to force the manager to open the safe at the back of the store, but the manager locked himself in a room. When Bridges heard a shot, he ran with Denem to the front of the market and saw that Howard and Singleton already had fled. Bridges then took food stamps from the cash register. Bridges said Howard had a .45 caliber handgun." (*People v. Denem*, *supra*, B318106.)

II. Verdict and sentence

In 2004, a jury convicted Hatter of special circumstance murder (§§ 187, subd. (a), 190.2, subd. (a)(17); count 1) and of robbery (§ 211; counts 2 & 3) with true findings on principal gun use (§ 12022.53, subds. (c), (d) & (e)(1)) and gang (§ 186.22, subd. (b)(1)) allegations.[6] That same year, the trial court sentenced Hatter on count 1 to life without the possibility of parole plus 25 years to life for the gun enhancement. The trial court imposed concurrent sentences on counts 2 and 3.

This Division affirmed Hatter's judgment of conviction on direct appeal. (*People v. Bridges*, *supra*, B176263.)

---

[6] The jury found the gang allegations true as to counts 1 and 3 only.

6

III.    Postconviction petition for resentencing

Thereafter, our legislature passed Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), which limited accomplice liability for murder and allowed eligible defendants convicted of murder to petition for resentencing.  In 2021, Hatter petitioned for vacation of his murder conviction and resentencing under that new law.  The trial court issued an order to show cause and held an evidentiary hearing.

At the outset of the evidentiary hearing, the trial court stated it had read the case file, including minute orders and trial transcripts, and had considered *People v. Bridges*, *supra*, B176263 for its procedural history only.  The People did not introduce any new or additional evidence.  However, Croslin and Hatter testified for petitioner at the hearing.

Croslin testified that on the day of the robbery, all participants met beforehand at Hatter's aunt's house, where they discussed the plan, but Croslin did not know until after the robbery that the plan included holding a security guard at gunpoint.  Hatter was the oldest of the participants.  Croslin and Hatter then drove to the market and walked through it, and Hatter told her they were going to rob the market.  Patrons and a security guard were in the store, but Croslin denied seeing the guard.  Croslin and Hatter left the market and drove past the other participants, who were waiting in their cars.  Croslin and Hatter then parked, and she saw individuals running out of the market with their faces covered.  The robbers all returned to the house, where one of the men said he thought he had killed the security guard.  Hatter told him to calm down, and not to worry, " 'They don't have anything on you.' "  The men split the money.  At no time while Croslin was with Hatter did they discuss

7

firearms. She did not learn that the security guard had been fatally shot until after the robbery.

Hatter testified that while planning the robbery they did not discuss using firearms, and Hatter was not personally armed with a gun. He first learned that firearms were used after the robbery, at the house.

In ruling, the trial court said it was discounting much of Croslin's testimony because it was "plainly unbelievable." The trial court also did not believe Hatter's testimony. It then found that Hatter was "the planner," had motive to commit the crime (to get his car out of impound), and directed the plan by checking out the location. The trial court accordingly found that Hatter was a major participant who acted with reckless indifference to human life. Further, the trial court found that Hatter was guilty as a direct aider and abettor who acted with implied malice. Because Hatter was guilty of murder under current law, he was not entitled to resentencing.

## DISCUSSION

I.  Senate Bill 1437 and standard of review

Senate Bill 1437, which took effect on January 1, 2019, limited accomplice liability under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder, to the end of ensuring that a person's sentence is commensurate with the person's individual criminal culpability. (*People v. Reyes* (2023) 14 Cal.5th 981, 984 (*Reyes*); *People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*).) As relevant here, Senate Bill 1437 amended the felony-murder rule by adding section 189, subdivision (e), which provides that a participant in the perpetration of qualifying felonies is liable for

felony murder only if the person: (1) was the actual killer; (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor; or (3) the person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in section 190.2, subdivision (d). (*Gentile*, at p. 842.)

Senate Bill 1437 also added section 1172.6, which created a procedure whereby persons convicted of murder under a now-invalid theory of murder may petition for vacation of their convictions and resentencing. A defendant is eligible for relief under section 1172.6 if the defendant meets three conditions: the defendant (1) must have been charged with murder under a theory of felony murder, (2) must have been convicted of first or second degree murder, and (3) could no longer be convicted of first or second degree murder due to changes to section 189 effectuated by Senate Bill 1437. (§ 1172.6, subd. (a).) If a petitioner makes a prima facie showing of entitlement to relief, the trial court shall issue an order to show cause (§ 1172.6, subd. (c)) and hold an evidentiary hearing at which the prosecution bears the burden of proving "beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder" under the law as amended by Senate Bill 1437 (§ 1172.6, subd. (d)(3)). The parties may offer new or additional evidence at the evidentiary hearing. (*Ibid.*) The trial court sits as an independent factfinder to determine beyond a reasonable doubt whether the defendant is guilty of murder under a valid theory of murder. (*People v. Garrison* (2021) 73 Cal.App.5th 735, 745.)

On appeal, we review the trial court's findings for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298; accord, *People v. Mitchell* (2022) 81 Cal.App.5th 575,

9

591.)  Under that standard of review we " ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' " (*Clements*, at p. 298.)  We presume in support of the judgment the existence of every fact that can be reasonably deduced from the evidence.  (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.)

As an initial matter, we reject Hatter's "object[ion] to the superior court denial on the grounds the court never found the People proved their case" beyond a reasonable doubt.  The only basis Hatter asserts for this objection is the speed with which the trial court issued its decision.  On appeal, however, we presume a trial court was aware of and followed applicable law in the absence of evidence to the contrary.  (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 398.)  Although the trial court here did not expressly refer to the burden of proof, nothing in the record shows that the trial court misunderstood its role as an independent factfinder who had to find beyond a reasonable doubt that Hatter had the requisite mental state for murder.

II.  Sufficiency of the evidence Hatter was a major participant in the felony who acted with reckless indifference to human life

Hatter contends that the trial court erred by denying his section 1172.6 petition because there was insufficient evidence to support its conclusion that he was a major participant in the felony who acted with reckless indifference to human life.  As we now explain, we agree that there is insufficient evidence Hatter acted with reckless indifference to human life.

10

A. *What it means to be a major participant who acts with reckless indifference to human life*

This area of law regarding what it means to be a major participant in a crime who acts with reckless indifference to human life has its genesis in two United States Supreme Court cases: *Enmund v. Florida* (1982) 458 U.S. 782 and *Tison v. Arizona* (1987) 481 U.S. 137. *Enmund* held that the death penalty could not constitutionally be imposed on an armed robbery getaway driver who was a minor participant in the crime, was not present when the murder was committed, and had no intent to kill. (*Enmund*, at pp. 798, 801.)

In contrast, *Tison v. Arizona, supra*, 481 U.S. at page 139, did not preclude imposing the death penalty for two defendants, brothers, who had helped their father and his cellmate—both convicted murderers—escape from prison. The defendants gave them guns, and the group later kidnapped a family of four. The defendants then stood by while their father debated whether to kill the family and proceeded to shoot the family, including a toddler and a teenager. (*Id.* at pp. 139–141.) The court held that the Eighth Amendment does not prohibit imposing the death penalty on a nonkiller who lacked the intent to kill, but whose "participation [in the crime] is major and whose mental state is one of reckless indifference to the value of human life." (*Id.* at p. 152; see also *id.* at pp. 157–158.)

Years later, in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), our Supreme Court addressed *Enmund* and *Tison* and substantially clarified the "major participant" and "reckless indifference to human life" requirements. *Banks*, at page 794, considered "under what circumstances an accomplice who lacks the intent to kill

11

may qualify as a major participant." The court listed various factors that should be considered in making that determination: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.)

The court then turned its attention to "reckless indifference to human life" in *Clark*. Reckless indifference to human life is " 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Clark*, *supra*, 63 Cal.4th at p. 616.) It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.) Recklessness has both a subjective and an objective component. (*Ibid.*) Subjectively, the defendant must consciously disregard risks known to him. Objectively, recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,' " that is, whether defendant's conduct " 'involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.' " (*Ibid.*)

*Clark* listed factors to consider when determining whether reckless indifference existed: "Did the defendant use or know that a gun would be used during the felony? How many weapons

12

were ultimately used?  Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?  What efforts did the defendant make to minimize the risks of violence during the felony?"  (*In re Scoggins* (2020) 9 Cal.5th 667, 677 [summarizing *Clark* factors].)

Cognizant that the *Banks* and *Clark* factors overlap, we next focus our analysis on whether Hatter acted with reckless indifference to human life, without deciding whether he was a major participant.  (See, e.g., *Clark*, *supra*, 63 Cal.4th at p. 614 [declining to decide whether defendant was major participant].)

B.  *Reckless indifference to human life*

In reaching its conclusion that Hatter was not entitled to relief, the trial court relied primarily on evidence Hatter planned the robbery.  To be sure, Hatter was intimately involved in planning the robbery:  planning discussions took place at his home; Hatter's motive for the robbery was to get his car out of impound; Hatter cased the market; Hatter greenlit the robbery after casing the market; and after the robbery, Hatter told an accomplice to get rid of a car, apparently because it had been identified.

Notwithstanding this evidence of Hatter's leadership role in planning the robbery, Hatter is little different than the defendant in *Clark*, who was the robbery's "mastermind," having planned and organized the robbery and orchestrated the events at the scene.  (*Clark*, *supra*, 63 Cal.4th at p. 612.)  Even so, the *Clark* court found he did not act with reckless indifference to

13

human life based on a consideration of other factors, including that the defendant planned for his accomplice to use an unloaded gun.  (*Id*. at pp. 618–619.)

Of course here, Croslin testified that the plan included pointing a gun at the security guard, and we will assume Hatter knew the guns were loaded, as there is no evidence to the contrary and the trial court disbelieved Hatter's testimony he did not know guns would be used.  While wielding a gun during a robbery certainly can weigh in favor of a reckless indifference to human life finding (see, e.g., *People v. Bradley* (2021) 65 Cal.App.5th 1022, 1033 [personally wielding gun during robbery reflects reckless indifference to human life]; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089 [defendant enabled murder by using gun to keep victims at bay during bank robbery]), it does not necessitate such a finding.  Instead, *Clark supra*, 63 Cal.4th at page 617, instructs that a defendant's mere knowledge his accomplices are armed is insufficient by itself to establish reckless indifference to human life.  (Accord, *In re Scoggins*, *supra*, 9 Cal.5th at p. 682 [anyone who plans or participates in armed robbery anticipates lethal violence might be used, given that 1 in 200 armed robberies results in death; that alone does not establish reckless indifference to human life].)  Therefore, Hatter's knowledge that his accomplices would hold victims at gunpoint does not establish his reckless indifference to human life.

We would find to the contrary if the evidence showed that the plan included Denem shooting at the ceiling or Howard shooting the security guard.  Instead, the evidence suggests that use of lethal force was *not* planned.  (Compare *People v. Williams* (2015) 61 Cal.4th 1244, 1281–1282 [defendant acted with reckless

14

indifference to human life where he instructed fellow gang members carrying out carjackings to shoot resisting victims].) When the robbers regrouped at the house after the robbery, Howard was pacing back and forth, scared, repeating, " 'I shot him.' " There was a "lot of arguing," and people were telling Howard to calm down and to shut up. Also, Jackson testified that after the men learned someone had died, they were "just saying it was messed up." Bridges was unhappy that Howard shot Hernandez, because they would have gotten more money had Howard not been "trigger happy." Thus, the robbers' reactions to the murder were ones of surprise, fear, and upset that it precluded them from getting more money—all of which, while callous, shows that lethal force was unplanned.

Next, although Hatter cased the market and approved it as the robbery's target, he was not in the market during the robbery and instead was outside, in a parked car. Hatter was therefore nowhere near Howard when Howard shot the security guard and in no position to restrain Howard. (See, e.g., *In re Scoggins*, *supra*, 9 Cal.5th at p. 679 [quickness of shooting suggested defendant lacked control over accomplices' actions]; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 989 [defendant lacked meaningful opportunity to intervene when he and shooter were on opposite sides of victim's car, and attempted carjacking was quickly executed]; *In re Moore* (2021) 68 Cal.App.5th 434, 452 [defendant present during robbery but not " 'close enough' " to restrain shooter].) Where, as here, there is no evidence lethal force was part of the agreed-upon plan, absence from the scene "may significantly diminish culpability for death." (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. 5; accord, *Clark*, *supra*, 63 Cal.4th at p. 619 [proximity to murder and events leading to it "may be

15

particularly significant where, as in *Tison*, the murder is a culmination or a foreseeable result of several intermediate steps"]; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1008–1009, 1023–1024 [defendant planned robbery but was not present during murder, so culpability was based on role as planner and driver for a robbery rather than on actions on the ground in events leading to murder].)

      Although Hatter's absence from the murder scene meant he had no control over the events once they started, there is otherwise no evidence Hatter tried to minimize the risk of violence. Instead, he and Croslin cased the market, which suggests he would have seen the security guard and noted he was armed, as Hernandez wore a security belt with a gun holster.[7] Yet, Hatter approved the market to rob[8] and decided to rob it in the morning, when employees and customers were present. (Compare *People v. Owens*, *supra*, 78 Cal.App.5th at p. 1024 [bank robbery posed high risk of violence because it occurred during business hours with 20 people present and robbers were armed], with *Clark*, *supra*, 63 Cal.4th at pp. 621–622 [plan to rob store after it was closed minimized risk of violence]; *In re Scoggins*, *supra*, 9 Cal.5th at p. 677 [defendant's plan to beat victim and steal his money did not involve use of weapons].) That the plan included armed men entering a busy market could heighten the risk of violence, even if the plan did not include

---

[7] At trial and the evidentiary hearing, Croslin testified that she could not remember seeing a security guard. The trial court disbelieved this testimony.

[8] After casing the market, Croslin and Hatter drove down 58th Place, which signaled to the others to proceed with the robbery.

what in fact happened:  Denem shooting at the ceiling, and Howard shooting Hernandez.

The next factor we examine is the crime's duration because there is generally a greater opportunity for violence when victims are held at gunpoint or restrained for prolonged periods.  (*Clark*, *supra*, 63 Cal.4th at p. 620.)  It is unclear how long the robbery lasted.  But the plan included forcing the manager to open the safe at the back of the store.  A robbery involving moving victims and opening a safe could be one of some duration, certainly longer than a quick grab and go robbery.  Still, it is unclear the planned duration of the robbery here increased the likelihood of violence beyond that in *Clark*, where the plan was to handcuff a computer store's employees in a bathroom so that the robbers could load computers into a van.  (*Id*. at pp. 620–621.)  Although the *Clark* robbery was planned to be of "substantial duration" (*id*. at p. 620), the interaction between the robbers and victims was designed to be limited (*id*. at p. 621).  So even though the robbery was in a public space and involved the prolonged detention of employees and risk of interlopers (indeed, the murder victim was an employee's mother who had come to pick up her child from work), the duration of the felony was insufficient to support a conclusion the defendant acted with reckless indifference to human life.  (*Ibid.*)

Handcuffing victims and forcing them into a bathroom— even in the absence of a loaded weapon—creates a volatile situation.  The risk a victim might resist or fight back, prompting a violent response from the robbers, is just as likely in the *Clark* scenario as here, it seems to us.  Moreover, because Hatter was not present during the robbery, this factor is nuanced as to him, as he had no immediate control over the events once they started

17

and could not, for example, call off the robbery once the violence escalated.  Therefore, we cannot find the differences between the *Clark* robbery and this one significant enough to dictate a different finding on the reckless indifference to human life prong.

As for what Hatter knew about any propensity for violence his accomplices, and in particular Denem and Howard, might have had, there is no evidence on this factor, other than that all participants were gang members.  But mere co-membership in a gang does not by itself establish knowledge of a propensity for violence.  (See, e.g., *In re Miller* (2017) 14 Cal.App.5th 960, 976 [although defendant and killer belonged to same gang and had committed follow-home robberies together, no evidence they had participated in shootings, murder, or attempted murder].)

Nor does the evidence show that Hatter callously failed to aid the wounded security guard.  (See generally *Clark, supra*, 63 Cal.4th at p. 619; *In re Parrish* (2020) 58 Cal.App.5th 539, 544 [reckless indifference shown by failure to aid or comfort victim]; *People v. Douglas* (2020) 56 Cal.App.5th 1, 10 [petitioner "displayed no interest in moderating violence or in aiding his bloody and suffering victim," and instead picked his pocket].) Hatter saw his accomplices flee the store, but the evidence does not show he knew that Hernandez had been shot.  The evidence suggests to the contrary, because when the men were back at the house, Howard informed the others that he had shot the security guard, while Hatter tried to calm the agitated Howard.

In evaluating the sufficiency of this evidence to support the trial court's finding, we are mindful that no one *Clark* factor " 'is necessary, nor is any one of them necessarily sufficient.' " (*Clark, supra*, 63 Cal.4th at p. 618.)  Rather, we evaluate the factors under the totality of the circumstances to determine Hatter's

18

place on the culpability spectrum. (*In re Scoggins*, *supra*, 9 Cal.5th at p. 675.) Ultimately, we cannot find that the factors weighing in favor of a reckless indifference finding—that the robbery occurred during regular business hours in a busy store where customers and employees were present and that the plan involved moving victims at gunpoint—outweigh those factors showing that Hatter did not knowingly create a grave risk of death. That is, there is no evidence the plan included lethal violence or that Hatter knew his accomplices had a propensity for violence. Hatter was not present when the robbery and murder took place, and therefore he had no control over events on the ground and was in no position to restrain his accomplices or to help Hernandez.

III.     Sufficiency of the evidence of implied malice murder

The trial court alternatively found that Hatter was guilty of implied malice murder.[9] Based on a similar rationale as expressed above, we cannot find there was substantial evidence to support Hatter's murder conviction under this alternative theory.

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be express or implied. (§ 188, subd. (a).) The primary difference between the two is the former requires an intent to kill but the latter does not. (*People v. Soto* (2018) 4 Cal.5th 968, 976.) Implied malice murder requires the killing be proximately caused by an act, " ' " 'the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his

---

[9]     Implied malice murder is murder in the second degree. (§ 189, subd. (a).)

19

conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*Reyes*, *supra*, 14 Cal.5th at p. 988.) Proximate causation thus requires the act to have been a substantial factor contributing to the death. (*Ibid.*)

The guilt of an aider and abettor to a crime, including murder, is "based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) "A person aids and abets the commission of a crime when [the person], (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.)

Accordingly, for aiding and abetting liability on a theory of implied malice murder to be imposed, a direct aider and abettor must, by words or conduct, aid the perpetrator's commission of a life-endangering act with the "knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life," and the aider and abettor must act "in conscious disregard for human life." (*People v. Powell* (2021) 63 Cal.App.5th 689, 713, italics omitted, cited with approval by *Reyes*, *supra*, 14 Cal.5th at p. 991 [implied malice murder requires proof of aider and abettor's "knowledge and intent with regard to the *direct perpetrator's* life endangering act"].) In other words, under current law, "a direct aider and abettor of the killing who knew that his (or her) conduct endangered the life of another and acted with conscious disregard for life, may be guilty of second degree murder." (*People v. Langi* (2022) 73 Cal.App.5th

20

972, 979.)  Implied malice remains a valid theory of second degree murder liability for an aider and abettor after Senate Bill 1437's enactment.  (*Reyes*, *supra*, 14 Cal.5th at p. 991; *Gentile*, *supra*, 10 Cal.5th at p. 850.)

Here, the trial court never clearly identified what act or acts Hatter performed or aided and abetted that proximately caused the security guard's death, although it appears the trial court relied on Hatter's planning activities, i.e., scoping out the market and giving the greenlight for the robbery to proceed.[10] However, an act that merely creates a dangerous situation in which death is possible, depending on how circumstances unfolded, standing alone will not satisfy the proximate causation requirement of implied malice murder.  (*Reyes*, *supra*, 14 Cal.5th at p. 989.)  Rather, implied malice murder requires a high probability death will result; the danger to life cannot be merely vague or speculative.  (*Ibid.*; *People v. Cravens* (2012) 53 Cal.4th 500, 513 [probability of death cannot be remote or merely possible].)

In *Reyes*, *supra*, 14 Cal.5th at page 985, for example, the defendant Reyes was at a park with fellow gang members, one of whom openly displayed a gun.  After someone in Reyes's group called out to a passing car, the group chased the car, and someone (not Reyes) shot at the car, killing its driver.  (*Ibid.*) Our California Supreme Court found that Reyes's act of traveling with an armed fellow gang member into rival gang territory could result in a gang confrontation during which it was *possible* someone could get hurt or killed, but the act did not by itself "give

---

[10]    The People also do not identify what act or acts Hatter engaged in or aided and abetted that proximately caused the death.

21

rise to a high degree of probability" death would result. (*Id.* at p. 989.) Further, there was no evidence Reyes's "acts precipitated or provoked the shooting." (*Ibid.*) And if the act of shooting was the dangerous act, there had to be evidence Reyes knew the shooter intended to shoot, to aid him in shooting, knew shooting was dangerous to life, and acted in conscious disregard to life. (*Id.* at pp. 991–992.)

Similarly here, Hatter's act of planning the armed robbery, including casing the market, certainly created a dangerous situation in which death was possible, depending on how circumstances unfolded. But it did not create a high probability of death, especially given the absence of evidence that the robbery plan included lethal violence. Indeed, what the *Reyes* defendant did could be viewed as just as dangerous as what Hatter did. The *Reyes* defendant was with fellow gang members, one of whom he knew was armed with a gun; they issued what inferentially was a gang challenge to the passing victim; and they pursued that victim. Therefore, some type of physical confrontation was planned or expected, even if there was not a high probability of death. In contrast, Hatter planned an armed robbery at which he was not present, and which did not include planned violence. Further, as in *Reyes*, even though the evidence supports a finding that Hatter knew his accomplices were armed, there is no evidence Hatter knew that either Denem or Howard intended to shoot. Rather, the evidence is to the contrary, that they were not supposed to use lethal force.

Thus, viewing the evidence in the light most favorable to the trial court's order, the record does not contain substantial evidence that Hatter aided and abetted Hernandez's murder with implied malice.

## DISPOSITION

The order denying Claudell Hatter's Penal Code section 1172.6 petition is reversed with the direction to the trial court to vacate his murder conviction and to resentence him in accordance with section 1172.6.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

EGERTON, J.

ADAMS, J.

23